In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00376-CV**
_____

**IN THE INTEREST OF E.K.H.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 20-08-09866-CV**

**MEMORANDUM OPINION**

Does evidence that none of Mother's four children lived with her, that Father and Mother are in an abusive relationship, that Mother admitted she has a prior criminal conviction for endangering one of her other children, and that Mother failed to comply with the requirements of her Family Service Plan offer legally and factually sufficient evidence to support the trial court's order that Mother endangered *Emilio,* her eighteen-month-old son?[1] Mother appealed from the order

---

[1]We use pseudonyms for the names of the minor and those of his family to protect the minors' identities. Tex. R. App. P. 9.8 (allowing courts to protect the identities of minors in parental-rights termination cases).

and argues the evidence is insufficient to support the trial court's findings terminating her relationship with Emilio and to support the trial court's best-interest finding.[2] But after reviewing Mother's arguments, we conclude the record contains sufficient evidence to support the trial court's findings on endangerment and its best-interest finding, and for those reasons will affirm.

## Background

In August 2021, the Department's suit against Mother and Father was called to trial. Mother and Father appeared and testified in the trial. Along with their testimony, the trial court heard from five other witnesses: (1) Ashley Wiseniske, an investigator formerly employed by Child Protective Services; (2) Rosalind McCray, the caseworker the Department assigned to Emilio's case; (3) Officer Rai Duenas, a certified peace officer employed by one of the constable offices in Montgomery County; (4) the CASA supervisor, who testified that she met with Emilio's parents and that in July 2021, she visited their home; and (5) the CASA, assigned to Emilio's case as of May 2021, who testified that, in her opinion, it was in Emilio's best interest for the court to terminate his relationship with Mother and Father.

---

[2]The trial court terminated Mother's rights on three predicate grounds, condition endangerment, conduct endangerment, and for failing to comply with the provisions of a court-ordered Family Service Plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). The trial court also found that terminating Mother's parent-child relationship with Emilio is in Emilio's best interest. *Id*. § 161.001(b)(2).

When Mother and Father testified, they explained that they have three children together, *Henry* (who is five), *David* (who is three), and Emilio (the eighteen-month-old child, and the subject of this proceeding). Besides the children Mother has with Father, Mother testified she has a son *Freddie*, age six. Of the children Mother and Father have together, however, none currently live with the parents in their home. When the trial occurred, Henry (based on his placement by the Department) was living with Father's mother, David (based on his placement by the Department) was living with Mother's sister, and Emilio (based on his placement by the Department) was living in foster care.[3] As to Henry, Mother testified that when she sees him, her visits are supervised. Turning to Freddie, Mother's oldest child, Mother explained that Freddie lives with his biological father. Mother testified she has not seen Freddie in four years. According to Rosalind McCray, the caseworker assigned by the Department to Emilio's case, Mother told her that a court order limits the Mother's rights to see Freddie.[4] For her part, Mother testified she has the right to legally see

---

[3]At trial, the Department failed to develop a record that explains why the Department removed Henry and David from Mother's home. Instead, the evidence merely shows that Henry and David were removed and placed with members of Mother's and Father's family. At trial, Father testified Henry has been living with his Mother for nine or ten months. So even though the record is unclear about why the children were removed, it appears from Father's testimony that the Department's suit as to Henry's case was filed in October or November 2020, three or four months after the Department sued Mother and Father to terminate their rights to Emilio.

[4]During the trial, the attorney representing the Department neither offered the court order that McCray referred to when she testified, nor did the Department's attorney introduce the order of removal that limits Mother's rights to visit or contact

Freddie, she simply has not done so in the past four years. As to David, the CASA testified Father told her that he and Mother have not had contact with David. And Father explained that until shortly before the trial, he did not know where David was and had not known "[f]or quite a while."

During Mother's testimony, Mother admitted she had been sentenced to prison after she was convicted of credit card abuse and for endangering a child. According to Mother, she was taken to prison around six weeks after Emilio was born and after the trial court revoked the order the trial court issued when it placed Mother on community-supervision after she pleaded guilty to indictments charging her with "credit card abuse and child endangerment." Mother explained the case on the child-endangerment charge arose from conduct when she was with Henry.[5]

And while the evidence before the trial court was not well developed, the record does contain some evidence that tends to show Mother and Father are in an abusive relationship, a dynamic that has existed for many years. According to

Freddie to impeach Mother's testimony that seems to suggest that seeing Freddie is no more than a voluntary decision that she can change.

[5]The attorney for the Department didn't offer a certified copy of the judgment into evidence of the convictions in either Mother's credit card abuse case or Mother's child endangerment case. *See* Tex. Penal Code Ann. § 22.041 (Abandoning or Endangering a Child), § 32.31 (Credit Card or Debit Card Abuse). The better practice would be for the Department's attorneys to obtain certified copies of the judgments of convictions relevant to the Department's cases so the records in their cases don't depend on a parent's testimony about the statute or statutes relevant to the parent's conviction.

Mother, Father hit her for the first time in 2017 or 2018. Mother testified Father was arrested at that time. According to Mother, the prosecutor, at Mother's request, dropped the charges that were filed against Father for hitting her when she appeared in court.

Besides the incident in 2017 or 2018, Mother testified that in April 2021, after escaping from Father's car and entering the mall, she told a police officer who came to the mall that Father had assaulted her that day. According to Mother, an employee Mother encountered in the mall called 911 after Mother, while crying, told the store employee that Father hit her. Mother told the officer to whom she spoke she was afraid of Father, that Father hit her, had choked her, and that she was "scared of him and his violence."

During the trial, Mother was questioned about what happened to Father after she reported the incident to police at the mall. Mother admitted that she told the officer that Father choked her, admitted she told the officer she was scared of Father, and admitted she told the officer she was afraid of Father's violence. Even so, Mother then claimed that she overly dramatized what had really occurred, claiming she did so merely to enlist the officer to help her keep Father away from her that day. According to Mother, police arrested Father based on the report she filed. Even though Mother agreed the report she filed led to Father's arrest, Mother testified she

5

is now "working with [Father's] attorney to get [the charges she filed] dismissed."[6] Mother denied her marriage to Father involves domestic violence, and she testified see needs no help to stay safe.

Officer Ray Duenas, who stopped Father's car, testified he saw Father driving a car and stopped him for violating a traffic law. After stopping Father, officer Duenas searched Father's car, found marijuana inside, arrested Father, and charged him with possession.[7] At trial, Officer Duenas testified that he was concerned for the child in Father's car because Father said, "he was smoking inside of the vehicle." During the stop, Father told Officer Duenas that Mother was in prison. Because Officer Duenas was concerned about the possibility that the smoke might have affected the child, he called for a medic, who came to the scene and checked out the child. Officer Duenas explained that after the medic checked Emilio, Emilio was

---

[6]Apart from Mother's brief and her rather vague testimony, the record contains little other evidence showing what occurred at the mall or about the event that led to Mother reporting Father to the police. When the Department's attorney questioned Father about whether Father hit Mother, threatened her, or assaulted her in any way, he said "No." The Department's attorney made no effort to impeach Father, such as by introducing the records of his arrest, the 911 call that caused police to go to the mall, calling the officer who spoke to Mother at the mall, or offering the official report filled out by the officer to whom Mother spoke at the mall. The record also does not show if Father has been indicted by a grand jury as a result of the complaint Mother filed with the police about the incident Mother reported at the mall.

[7]Officer Duenas did not charge Father with driving while intoxicated nor did the officer testify that Father did not seem to have the normal use of his mental or physical faculties during the stop.

released from the scene. Because Emilio had no one to take him home, Officer Duenas took the child to his office. He called Child Protective Services and asked that agency to send someone to come pick the child up.

The day after Father was arrested for possession of marijuana, the Department sued Mother and Father and sought an emergency order asking the trial court to give the Department the authority to take Emilio, temporarily, into custody. In the same petition, the Department asked the trial court to name the Department as Emilio's temporary managing conservator. The petition also asked the trial court to terminate Mother's and Father's parental rights on several grounds, which includes sections 161.001(b)(1)(D) and (E), if the child could not safely be reunited with his parents. In due course, the trial court, by order, named the Department Emilio's temporary managing conservator.

In October 2020, the trial court, by order, required Mother and Father to comply with a Family Service Plan. The plan's stated long-term goal was "Family Reunification," but an alternative goal of "Unrelated Adoption" is listed as a concurrent goal in the plan.[8] About a month after the trial court ordered Mother and Father to comply with the Family Service Plan, Mother was released from prison. Mother testified that after she was released from prison, she moved to Fort Worth.

---

[8]The record shows the Department never amended the Family Service Plans.

When Father testified, he explained he works as a contract laborer, building fences, pouring concrete, and working on shrimp boats. More recently, Father said his work has involved providing janitorial services in the greater Dallas-Fort Worth area. Father also testified about his relationship with Mother. But when asked about domestic violence, Father denied having ever hit, assaulted, or threatened Mother. When asked whether he'd been contacted by authorities about allegations of domestic violence, Father testified: "I can't recall, ma'am."

Turning to the stop, Father testified he was not smoking marijuana before he was stopped by Officer Duenas that day. And in the trial, Father minimized his past use of illegal drugs. According to Father, he has used nothing but marijuana in the past, claiming he began using that drug only a short time before he was stopped.[9] As to Father's other two older children, Henry and David, Father testified they have been "through the courts" and have been placed with members of his and Mother's families.[10] But none of the attorneys questioned Father about the reasons leading to the Department's removal of Henry and David from their parents. That said, Father at one point appears to have suggested being homeless as the reason the Department took David into its care.

---

[9]Father was never asked to define whether the period he was describing was a period of hours, days, weeks, or months.

[10]The Department never authenticated or offered into evidence the court orders relevant to the cases that involved Henry or David.

At trial, Wiseniske, who worked for Child Protective Services for about a year before leaving the agency in April 2021, testified she responded to a call from her supervisor and then picked Emilio up from the Montgomery County Constable's office before placing Emilio in a foster home. According to Wiseniske, the Department removed Emilio from his parents because the Department believed Emilio was being neglected by his parents. On cross-examination, Wiseniske explained she was dismissed from Child Protective Services because she had an overwhelming workload, and because she could not fulfill the duties required of her by her employer.

McCray, the CPS caseworker, testified that Mother and Father failed to complete several requirements of their respective Family Service Plans.[11] When asked about the Department's plans, McCray testified that the Department's long-term goal for Emilio is unrelated adoption. Even so, there was no evidence that Emilio's current foster family, when the trial occurred, was willing to adopt him. McCray also testified that she asked Mother and Father whether a relative might be willing to take Emilio, but they told her they "did not want him moved." And while

---

[11]Among the ways Mother failed to comply with her Family Service Plan, according to McCray, was that she failed to participate in the random drug tests the Department requested of her after it removed Emilio and placed him in foster care. Mother's plan—one of the exhibits admitted at trial—required Mother to participate "in all random UAs and hair follicle tests requested by The Department."

McCray testified that she talked with Mother and Father about placing Emilio with a relative again more recently, and Mother and Father told her again they had no relatives who were willing to take Emilio. As to the relative that McCray said she contacted, McCray explained: "One of the relatives informed us that they already had one of the child[ren] and that they could not take another one." McCray testified the Department should, in her opinion, be named primary managing conservator of Emilio because his parents had not completed their service plans and because Emilio is doing well, he is healthy. McCray also expressed her opinion that appointing the Department is "in [Emilio's] best interest." McCray testified the Department has concerns that domestic violence issues exist between the parents, and she was critical of Mother's failure to follow through with recommendations made by a counselor Mother spoke to who recommended that Mother attend classes on domestic violence. Even so, on cross-examination, McCray admitted the Department never amended the Family Service Plan to add classes for either Mother or Father to attend on domestic violence to their plans.

The CASA supervisor on Emilio's case testified that, over the course of handling the case, she met with Mother, Father, and communicated often with the attorney ad litem who represented Emilio and with Child Protective Services. The supervisor explained that in July 2021, she visited Father and Mother in their home. Based on what she observed when visiting the parents' home, the supervisor thought

from what she observed in the home the home would be one that was an appropriate one for a child. That said, the supervisor explained she has concerns about whether Emilio's parents were truthful with her about the reasons they cancelled five earlier visits she scheduled to see the home, cancelling the visits on the basis the home had been damaged in a flood. But when the supervisor saw the home, she said she saw nothing that appeared to have been damaged by a flood.

The supervisor also mentioned that when visiting the parents, she asked Father several questions to rule out concerns she had about domestic violence given the history she had about Father's conduct in the past. When the supervisor asked Father about the incident Mother reported to police at the mall, she said Father told her "he didn't have an excuse yet because he hadn't talked to his attorney." The supervisor testified Father also said that when he and Mother have altercations, his mother comes over, talks to his wife, and then tells him to "take a walk and leave the home." When asked for her opinion about Emilio's best interest, the supervisor said she thought Emilio would best be served by the court terminating Mother's and Father's parental rights because Mother and Father failed to complete the services required by their plans, failed to bond with Emilio, and that safety concerns existed for Emilio based on an ongoing history of domestic violence and instability in the parents' home.

The testimony of Emilio's CASA also favors the trial court's finding terminating Mother's and Father's relationship with Emilio. The CASA testified that until recently, Mother and Father had not visited Emilio in person. In the CASA's opinion, the parents and Emilio had not bonded. The CASA put it this way: "[Emilio] doesn't really have an idea who they are." To be sure, the CASA acknowledged that Mother and Father exercised their visitation rights virtually (over the internet) given the limitations related to the Covid-19 pandemic. These restrictions were imposed for in-person visits in foster homes by the Department. The CASA expressed a concern that Mother and Father had not complied with the random drug testing required by their respective Family Service Plans, explaining that when their drug tests were scheduled, "they just never [took] place." When asked for her opinion about terminating Mother's and Father's parental rights, the CASA testified that in her opinion, terminating Mother's and Father's parental rights is in Emilio's best interest. Finally, the CASA addressed Emilio's current placement, explaining Emilio is a happy, healthy, and well-adjusted child.

In the end, the trial court found that terminating Mother's and Father's parental rights is appropriate under subsections D, E, and O of the Family Code.[12] Along with these predicate findings, the trial court found that terminating Mother's

---

[12]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

and Father's rights to Emilio is in his best interest.[13] Mother appealed from the trial court's order. Father, however, did not.

## Standard of Review

In a case terminating the relationship between a parent and a child, the Department must prove that at least one of the statutory grounds for terminating the relationship exists and prove that terminating the relationship is in the child's best interest.[14] Both the evidence presented to establish the grounds for termination and the best-interest finding must be proven by *clear and convincing evidence*.[15] *Clear and convincing evidence* is the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[16]

When, as here, the parent appeals complaining that there is not enough evidence to support the trial court's conduct endangerment or its condition endangerment findings, we review the evidence admitted during the trial and determine whether it allowed the trial court, acting as a reasonable factfinder, to form a firm belief or conviction the parent endangered the child.[17] In our review, we

---

[13]*See id.* § 161.001(b)(2).
[14]*Id.* § 161.001(b)(1)(A)-(U), (b)(2).
[15]*Id.* § 161.001(b); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).
[16]Tex. Fam. Code Ann. § 101.007.
[17]*In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (holding that in an appeal, the reviewing court must review the parent's issues that complain about the conduct

examine "the evidence in the light most favorable to the [trial court's] finding to determine whether [the court, acting reasonably,] could have formed a firm belief or conviction that its finding was true."[18] In deciding whether the evidence supports the findings challenged in an appeal, we consider whether the inferences the trial court drew from the evidence are "reasonable and logical[.]"[19] And since the trial court, acting as a factfinder, may reasonably infer facts from proof of other facts if those inferences are also reasonable, we must assume "the factfinder resolved disputed facts in favor of its finding" for any findings it could reasonably infer from the facts proven in the trial.[20]

Because we assume the trial court made all findings required that match its verdict, we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[21] Even though we disregard the evidence that a trial court could reasonably disbelieve, we do not disregard it when examining the record to see if it is sufficient to support the findings the trial court made when terminating a parent's rights.[22] Instead, when conducting a legal-sufficiency review, we examine all the evidence and determine whether the record

---

endangerment and condition endangerment findings based on the parent's right to due process).

[18]*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).
[19]*In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012).
[20]*In re J.F.C.*, 96 S.W.3d at 266.
[21]*Id.*
[22]*Id.*

shows a reasonable factfinder could have terminated the parent's relationship with her child after considering the evidence that favors the trial court's findings and the evidence the factfinder could not have reasonably disregarded or ignored even though that evidence might have favored another ruling.[23]

Mother also argues the evidence is factually insufficient to support the trial court's judgment. In conducting a factual sufficiency review, we determine whether the evidence admitted at trial allowed a reasonable factfinder to form a firm belief or conviction that the facts the Department needed to prove to prevail are true.[24] In our review, we credit all evidence favoring the Department on the claims on which it prevailed at trial if the evidence that supports that claim is clear and convincing.[25] But we also consider any evidence admitted during the trial that is contrary to the factfinder's verdict to decide whether the factfinder, in face of the conflicting evidence, could have resolved the dispute in the Department's favor.[26] If the factfinder could not have formed a firm belief or conviction that the Department's claims were true in light of all the evidence admitted in the trial, we will find the evidence insufficient to support the verdict, declare the verdict unsupported by clear and convincing evidence, and order a new trial.[27]

---

[23]*Id.*
[24]*Id.*
[25]*Id.*
[26]*Id.*
[27]*Id.*

15

Besides challenging the predicate findings relevant to the subsection D, E, and O grounds, the grounds the trial court relied on when terminating Mother's rights, Mother argues the evidence is insufficient to support the trial court's best-interest finding. When reviewing a best-interest finding, we measure the evidence against the various factors listed in the Family Code and those discussed in *Holley*.[28] If the evidence conflicts on the question about whether terminating the parent-child relationship is in the child's best interest, the factfinder may reasonably choose between the alternatives, and it may do so by weighing some evidence more heavily than it weighs other evidence in deciding what outcome will best serve the child's interests.[29] Still, evidence relevant to predicate findings is often also relevant to the factfinder's best-interest finding, if the evidence on the predicate finding is *clear and convincing*.[30]

Sufficiency of the Evidence – The Condition
Endangerment and Conduct Endangerment Findings

In issues one and two, Mother argues the evidence is legally and factually insufficient to support the trial court's findings of condition endangerment and conduct endangerment, the predicate grounds for terminating a parent-child

---

[28]Tex. Fam. Code Ann. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).
[29]*See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).
[30]Tex. Fam. Code Ann. § 161.001(b)(1), (2).

relationship under subsections 161.001(b)(1)(D) and (E).[31] While similar, the subsections are not identical. Under subsection D, the Department had to prove, by clear and convincing evidence, that Mother knowingly placed or allowed Emilio to remain in conditions or surroundings that endangered his physical or emotional well-being.[32] Under subsection E, the Department needed to prove, by clear and convincing evidence, that Mother knowingly placed Emilio with a person or allowed him to remain in a condition with a person who engaged in conduct that endangered Emilio's well-being.[33] Under either subsection D or E, the term *endanger* means "expose to loss or injury; to jeopardize."[34] Generally, a parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being.[35]

Often, evidence used to establish violations of subsections D and E overlaps. Subsection D doesn't require evidence that a parent engaged in conduct multiple times, and evidence that a parent engaged in either acts or omissions that endangered

---

[31]*Id.* § 161.001(b)(1)(D), (E).
[32]*Id.* § 161.001(b)(1)(D).
[33]*Id.* § 161.001(b)(1)(E).
[34]*In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021) (quoting *Endanger*, WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY OF THE ENGLISH LANGUAGE 599 (1976)).
[35]*See In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

a child, even a single act or omission may suffice.[36] Allegations involving subsection D violations require that courts examine the period before the Department removed the child from the home to evaluate the parent that placed or allowed the child to remain in a condition that endangered the child's physical or emotional well-being.[37] In contrast, allegations involving subsection E violations, may be "based on conduct both before and after removal."[38]

In cases involving claims to terminate a parent's rights to a child, domestic violence may be considered by the finder of fact as evidence that a parent has engaged in conduct or created a condition that endangers a child.[39] "[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child."[40]

Here, the evidence elicited in the trial allowed the trial court, acting reasonably, to form a firm conviction or belief that Mother was a victim of domestic

---

[36]*In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)).

[37]*Id.* (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)).

[38]*In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

[39]*See In re K.P.*, No. 09-13-00404-CV, 2014 Tex. App. LEXIS 9263, at *39 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.); *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied).

[40]*In re Z.L.M.*, No. 09-14-00457-CV, 2015 Tex. App. LEXIS 1097, at *10 (Tex. App.—Beaumont Feb. 5, 2015, no pet.) (mem. op) (quoting *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

violence and that Mother was refusing to address the issue. The incidents involved a similar pattern, Father hit Mother, Mother contacted the police, filed a report, and then contacted authorities to get any charges filed dropped after authorities brought charges against Father based on Mother's report. But as compared to the incident in 2017 or 2018, the incident in 2021 involved more violence—it involved kicking and choking, not just hitting. Simply put, the trial court had the right to consider whether the evidence revealed an ongoing pattern of domestic violence, a pattern Mother was contributing to by ignoring and creating a danger to Emilio's physical safety and emotional well-being too.

That said, there is more here than just simply a history of domestic violence to support the trial court's conclusion that Mother violated subsections D and E. Importantly, Mother admitted that she had, before Emilio was born, pleaded guilty to endangering her child Henry. While Mother was not pronounced guilty when she pleaded guilty to endangering Henry, the record still shows the trial court found her guilty of endangering a child and shows she was sentenced to prison for endangering Henry about six weeks after Emilio was born.

The standard of review that applies to our review of the appeal of a parental rights termination case requires that we review all evidence admitted in the trial. As applied here, that includes Mother's testimony admitting to a conviction for endangering Henry, even though the Department didn't create a record that includes

a copy of the judgment of conviction relevant to Mother's conviction for endangering Henry.[41] Under Texas law, a defendant commits an offense of abandoning or endangering a child by either:

(1) . . . intentionally abandon[ing] the child in any place under circumstances that expose the child to an unreasonable risk of harm; [or]

(2) . . . intentionally knowingly, recklessly, or with criminal negligence, by act or omission, engag[ing] in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment.[42]

So while Mother's conduct about endangering Henry occurred before Emilio was born, the trial court could still consider it in deciding whether Mother engaged in conduct that endangered Emilio since the conduct that lies at the heart of the

---

[41]*In re J.F.C.*, 96 S.W.3d at 266. As an aside, we note that Mother says in her brief that her "criminal history was admitted into evidence." But her statement is inaccurate, the record simply does not include Mother's conviction for endangering Henry. Mother supports the statement she made in her brief by citing the Court to Petitioner's Exhibits P-7 through P-13. As to these exhibits, the record shows the following: (1) P-7 is a Health and Human Services report, a report that concerns suits affecting Mother's parent-child relationships as of October 20, 2020; (2) P-8 and P-9 are not in the appellate record before the Court; (3) P-10 is a Judgment of Conviction relevant to Father's conviction for Possession of Marijuana, the conviction that relates to his arrest in Montgomery County; and (3) P-11 through P-13 are not in the appellate record. The record does not show the Department (or any other party) offered Exhibits P-8, P-9, P-11, P-12, or P-13 into evidence during the trial.

[42]Tex. Penal Code Ann. § 22.041(c).

matter—what standard does Mother follow when taking care of her children, and does that standard endanger Emilio's physical and emotional well-being?[43]

Together with considering Father's history of abusive conduct toward Mother and Mother's history of endangering Henry, the trial court also heard testimony that Mother's other children were being cared for by other adults. The evidence established that Mother's oldest child, Freddie, lives with his father. Mother has not seen him in four years, and she expressed no real desire to see him. To be fair, Mother didn't say she did not want to see Freddie, just that she hasn't seen him in four years even though she could. As to Henry—the child Mother pleaded guilty to endangering—Mother testified she sees Henry, but her visits with him are "supervised;" according to Father, the visits are supervised by his mother and father, which according to Father is where Henry lives. According to Father, David now lives with Mother's sister because that's where the Department placed him after removing him from his home when David became homeless.[44] Father admitted that he learned just a week before the trial that David was living with his sister-in-law

---

[43]*See In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("In determining whether the Department has established that the parent engaged in an endangering course of conduct, we may consider evidence concerning how a parent has treated another child or spouse."); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section E has been established.").

[44]At trial, the Department's attorney didn't ask Mother any questions about David or why the Department had to remove David from her home.

and before that, he had not known where David was living "[f]or quite a while." From Father's testimony, the trial court could have inferred that Mother didn't know where David was until shortly before trial and that she hadn't known for some time either.

From the evidence as a whole, we conclude the trial court could have formed a firm belief or conviction that terminating Mother's parental rights to Emilio was proper under subsections D and E.[45] As the sole factfinder, the trial court could reasonably find that Mother was in a relationship involving domestic abuse and that she had, in the past, placed a child in circumstances that exposed the child to an unreasonable risk of harm. The trial court could have also formed a firm belief or conviction that Mother, based on her conduct, continues to ignore the danger that domestic violence posed to Emilio, disregarding that danger based on her conduct, even though she was on notice the danger exists.[46] We overrule Mother's first two issues.

## The Best-Interest Finding

In issue four, Mother contends the evidence is legally and factually insufficient to support the trial court's best-interest finding. Under the Family Code,

---

[45]*See In re J.F.C.*, 96 S.W.3d at 264-65.

[46]*See In re S.R.*, 452 S.W.3d at 360 (subsections D and E both use the term *endanger*, which means "to expose a child to loss or injury or to jeopardize a child's emotional or physical health[]").

there is a strong presumption that keeping a child with a parent is in the child's best interest.[47] Even so, it is also presumed "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest."[48] When determining whether terminating the parent-child relationship is in the child's best interest, we consider the non-exclusive factors identified by the Texas Supreme Court in *Holley v. Adams*.[49]

In a best-interest analysis, courts focus on the best interest of the child, not the best interest of the parent.[50] Often, the evidence that supports the predicate findings on the D and E grounds may also support the trial court's best-interest finding.[51] And

---

[47]Tex. Fam. Code Ann. § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (noting that a "strong presumption" exists favoring keeping a child with its parent).

[48]Tex. Fam. Code Ann. § 263.307(a).

[49]In *Holley*, the Texas Supreme Court used these factors when reviewing the best-interest finding:
- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the party seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions that reveal the existing parent-child relationship is improper; and
- any excuse for the parent's acts or omission

*Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

[50]*Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995).

[51]*In re T.R.S.*, No. 09-18-00482-CV, 2019 Tex. App. LEXIS 4913, at *15 (Tex. App.—Beaumont June 13, 2019, no pet.) ("The same evidence that supports a

the Department need not present evidence to support each of the *Holley* factors, as the lack of evidence on some factors will not preclude the factfinder from forming a strong conviction that terminating the parent-child relationship is in a child's best interest, particularly when the evidence is undisputed that the parent endangered the child.[52] As the reviewing court, the question we must decide is whether the record, when considered as a whole, supports the trial court's best-interest finding.[53]

Turning to the *Holley* factors, the evidence allowed the trial court to conclude that Mother and Father did not, during their marriage, provide the children with a stable home. The court heard testimony that Mother has periodically suffered from periods of homelessness. For nine months, Mother was incarcerated, and during part of that time Father lived in various places while he worked as a day laborer and on shrimp boats. And already noted, the trial court found Mother engaged in conduct that endangered Henry. The trial court could rely on that finding in deciding it was not in Emilio's best interest for the court to return him to Mother and place him in her custody. Likewise, the trial court heard evidence sufficient to allow it to find that Mother and Father were in an abusive relationship. Mother was in denial her relationship with Father posed a danger to the safety and well-being of her children,

---

trial court's findings under subsections D, E, and O may also be relevant to the trial court's best-interest finding.").

[52]*In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

[53]*Id.* at 28.

including Emilio, as when charges were filed against Father, Mother worked to have the charges dismissed. Finally, the trial court heard testimony showing Mother failed to take the random drug tests required by her court-ordered Family Service Plan. From that evidence, the trial court had a right to infer that Mother was using an illegal substance, a substance that likely explained to some extent the reasons she was homeless, the reasons none of her children were living with her, and the reasons she allowed herself to remain a victim of domestic abuse.

There was also evidence that Mother failed to bond with Emilio. But we weigh that evidence against the evidence showing the Department imposed restrictions that limited in-person visits with Emilio while the suit was pending before the court. Even so, the evidence shows that Emilio, now eighteen months old, has not bonded with his parents.

The trial court also heard testimony that currently, Emilio is "a very happy child" who "likes to play with toys that make noise or music." There is also evidence showing he "smiles at everybody." Before entering the foster care system, Emilio was behind on his immunization schedule, but as of trial, Emilio was current on his immunizations. The Department testified about its long-term goal for Emilio, an unrelated adoption. Even though Emilio's current foster family (because of the ages of the foster parents) is unwilling to adopt Emilio, there are no barriers to adoption, according to McCray.

We recognize that a parent's rights to raise a child "are of constitutional magnitude," but a parent's rights as a parent are not absolute.[54] Mother simply has no right to put her interests above Emilio's and sacrifice his physical safety and emotional well-being to preserve the relationship she desires to have with him. Nothing at trial shows that the past patterns of conduct that Mother and Father engaged in changed and would not recur.

We hold the trial court did not abuse its discretion by preferring an outcome that placed Emilio in a stable, safe, and permanent placement over the outcome Mother preferred. While Emilio's current foster family is not an adoptive placement, there is evidence that Emilio is adoptable and is currently in a safe, stable, and loving home.[55]

Deferring to the trial court's role as the sole arbiter of the facts, as we must, we hold the trial court did not abuse its discretion by preferring a stable, safe, and permanent placement of the children over the outcome Mother preferred. To prove what outcome is in a child's best interest, the Department need not produce evidence in the trial on each factor used to decide whether terminating the parent-child

---

[54]*Id.*

[55]*See In re C.H.*, 89 S.W.3d at 28 (lack of evidence about definite plans for permanent placement and adoption cannot be the dipositive factor).

26

relationship is in the child's best interest.[56] We conclude the record contains legally and factually sufficient evidence to support the trial court's finding that terminating Mother's rights is in Emilio's best interest.[57] Because Mother's fourth issue lacks merit, it is overruled.

## Conservatorship

In her fifth issue, Mother contends that by appointing the Department as Emilio's sole managing conservator, the trial court abused its discretion. On appeal, we review a trial court's conservatorship determination using an abuse of discretion standard, meaning we may reverse the ruling only if the decision is arbitrary and unreasonable.[58] In our review, we consider whether the trial court had sufficient information on which to exercise its discretion, and whether the trial court erred in applying its discretion.[59]

On appeal, Mother argues a presumption favors awarding custody of the child to the child's parent.[60] Yet when the trial court terminated the parent-child

---

[56]*See id.* at 27 ("But we have never held that these considerations are exhaustive, or that all such considerations must be proved as a condition precedent to parental termination.").

[57]*See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *see also In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72.

[58]*In re J.A.J.*, 243 S.W.3d 611, 617 (Tex. 2007).

[59]*In re P.N.T.*, 580 S.W.3d 331, 360 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

[60]*See Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990).

relationship, the parent is no longer the "parent" of the child.[61] So the question we must decide is whether the trial court abused its discretion by choosing not to name the former parent as the managing conservator of the child, rather than the managing conservator the trial court chose to name.

Section 161.207(a) of the Family Code, requires that trial courts after terminating the parent-child relationship of both parents to the child to "appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child."[62] Thus, when the trial court appoints the Department as the child's sole managing conservator, the appointment is considered a "consequence of the termination" under section 161.207.[63]

Simply put, the evidence provides no support for Mother's claim that the trial court should have appointed Mother as Emilio's conservator. Mother's rights were terminated because she endangered Emilio, so the trial court did not abuse it discretion by refusing to appoint someone the evidence reveals is not a suitable and competent adult for managing the child.[64] And nothing in the record shows the trial

---

[61]*See Z.A.R. v. Tex. Dep't of Family and Protective Servs.*, No. 14-20-00511-CV, 2020 WL 7866800, at *15 (Tex. App.—Houston [14th Dist.] Dec. 31, 2020, pet. denied) (mem. op.).

[62]Tex. Fam. Code Ann. § 161.207.

[63]*In re V.A.*, 598 S.W.3d 317, 334 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); *see also In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam).

[64]*See* Tex. Fam. Code Ann. § 161.207.

court's decision appointing the Department—the agency identified by the Family Code as an eligible managing conservator—was arbitrary or unreasonable.[65] We overrule Mother's fifth issue.

Conclusion

Given our conclusion that the evidence supports the findings the trial court made under subsections D and E and the trial court's best-interest finding, we need not resolve Mother's third issue, Mother's issue challenging the trial court's finding that Mother violated the requirements of her court-ordered Family Service Plan.[66]

Thus, the Order of Termination in trial court cause number 20-08-09866-CV is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on February 24, 2022
Opinion Delivered April 7, 2022

Before Kreger, Horton and Johnson, JJ.

---

[65] *See id.*
[66] Tex. R. App. P. 47.1.